UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HRISTOS DASKALAKIS,<br>KALLIOPE DASKALAKIS,<br><br>Plaintiffs,<br><br>v.<br><br>CP INDY DT, LLC D/B/A HYATT REGENCY INDIANAPOLIS,<br>THYSSENKRUPP ELEVATOR CORPORATION,<br>OTIS ELEVATOR COMPANY,<br><br>Defendants. | ) | No. 1:24-cv-00271-JPH-MJD |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Hristos and Kalliope Daskalakis allege that they suffered emotional and psychological injuries from being trapped for six hours in an elevator at CP Indy's Hyatt Regency Hotel. The Daskalakises bring negligence claims against CP Indy and two companies contracted to maintain the elevator—Otis Elevator Company and TK Elevator Corporation ("TKE"). Defendants have filed motions for summary judgment. Dkt. [149]; dkt. [150]; dkt. [154]. For the reasons below, Otis's motion is **GRANTED** and the other motions are **DENIED**.

## I.
## Facts and Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

**A. Elevator Entrapment**

In early September 2023, Hristos and Kalliope Daskalakis went to the Hyatt Regency Hotel in Indianapolis to eat dinner at the top-floor restaurant. Dkt. 148-8 at 11 (Kalliope Dep. at 35–37). About 10:30 p.m., they entered an elevator to return to the lobby. *Id.* The elevator began to descend slowly but soon came to an "abrupt stop" with a "hard jolt." Dkt. 148-8 at 12–13 (Dep. at 41–42). A restaurant hostess made a phone call for help, *id.* at 13–14 (Dep. at 43–46), and someone from the hotel reset the elevator, *see* dkt. 162-1 at 6 (Hristos Dep. at 63). The elevator then descended again before coming to an "abrupt stop" that jolted the Daskalakises—like "hitting the brakes on a car"—and made the elevator sway "like a swing." *Id.* at 8–10 (Dep. at 65–68); dkt. 162-2 at 5 (Kalliope Dep. at 49). The Daskalakises called 911. Dkt. 148-8 at 15 (Kalliope Dep. at 50).

The Indianapolis Metropolitan Fire Department ("IFD") arrived at the hotel about 11 p.m. *See id.* at 17 (Dep. at 58). TKE's on-call mechanic, Danny Watters, arrived at the hotel about midnight. Dkt. 149-5 at 8, 12 (Watters Dep. at 18–19, 35). Mr. Watters was not the usual TKE mechanic for the Hyatt and had been there only once before. *Id.* He tried to reset the elevator, but it displayed a fault code that had to be fixed before the elevator would run. *Id.* at 14 (Dep. at 40–43). Mr. Watters needed the elevator's wiring diagrams to address the fault code, but he could not find them. *Id.*

After Mr. Watters told IFD that he couldn't find the diagrams he needed, the firefighters began an emergency evacuation from above the elevator. *Id.* at

15 (Dep. at 44–48). A firefighter went down the elevator shaft to the top of the elevator car to open the top emergency exit. *Id.* at 19 (Dep. at 62). After opening the external cover, the fireman could not open the interior exit panel. *Id.* at 20 (Dep. at 64); dkt. 148-9 at 11 (Thompson Dep. at 25–28). Eventually, the firefighters used a Sawzall and grinder to cut through parts of the interior panel until it released. Dkt. 148-9 at 13–14 (Thompson Dep. at 34–40).

Around 5 a.m., firefighters hoisted the Daskalakises out of the elevator with harnesses and ropes back to the top floor. Dkt. 148-8 at 17–18 (Kalliope Dep. at 58, 62). They were trapped for about six hours in the elevator. Dkt. 162-2 at 6.

**B. Elevator Service Contracts and Inspections**

CP Indy owns the elevator the Daskalakises were trapped in. Dkt. 162-6 at 3 (30(b)(6) Dep. at 19). CP Indy's management company signed an elevator maintenance contract with Otis beginning October 1, 2018, dkt. 148-2 (Otis Contract), then switched to TKE beginning March 1, 2023, dkt. 148-3; dkt. 148-4 at 15–16. The maintenance contracts required the contractors to "provide <u>proactive</u> preventative maintenance" and "regularly and systematically examine, clean, lubricate, adjust, and as conditions warrant, repair or replace all vertical transportation equipment included under this Agreement." Dkt. 148-2 at 8–9 (emphasis in original). The agreement also excluded from the contractor's responsibility "car enclosures" including "wall panels, door panels . . . [and] hung ceilings." *Id.* at 12.

In February 2023, Otis completed the elevator's last annual inspection before the entrapment, and the State of Indiana issued a certificate of operation. Dkt. 162-5 at 12–13 (Bangel Dep. at 54–55). The State also inspected the elevator in March and April 2023 and did not identify any issues except that the machine room needed to be cleaned. *Id.* at 13–14 (Dep. at 55–56). The State inspector did not attempt to open the elevator's interior exit panel. *Id.* at 8–9 (Dep. at 45–46).

After the entrapment, TKE concluded that the elevator got stuck because the auxiliary contacts had failed. Dkt. 162-8 at 22–24 (Watters Dep. at 81–83). TKE's maintenance records do not show that it inspected the contacts. *See* dkt. 162-13.

**C. Procedural History**

The Daskalakis brought this case against CP Indy, Otis, and TKE, alleging Indiana-law negligence claims related to the elevator repairs, maintenance, and inspection. Dkt. 61 (amended complaint). Defendants each moved for summary judgment. Dkt. 149; dkt. 150; dkt. 154.

## II.
## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584.

Indiana substantive law governs this case. *See Webber v. Butner*, 923 F.3d 479, 480–81 (7th Cir. 2019). Absent a controlling decision from the Indiana Supreme Court, the Court does its best to predict how that court would rule on the issues of law. *Mashallah, Inc. v. West Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir. 2021). In doing so, the Court may consider decisions from the Indiana Court of Appeals. *See id.*

## III.
## Analysis

The Daskalakises assert Indiana-law negligence claims regarding the elevator's installation, repair, maintenance, and inspection. Dkt. 61 (operative complaint). To prevail, they "must prove (1) that the defendant owed the plaintiff a duty of care, (2) that the defendant breached this duty by allowing their conduct to fall below the applicable standard of care, and (3) that the breach proximately caused a compensable injury." *Pennington v. Mem'l Hosp. of S. Bend, Inc.*, 223 N.E.3d 1086, 1094 (Ind. 2024).

**A. Otis Elevator Company**

Otis argues that no reasonable jury could find that it breached a duty to the Daskalakises because no designated evidence suggests that it had negligently maintained the elevator. Dkt. 150-1 at 12–14. The Daskalakises respond that there is an issue of fact about "whether Otis disabled the interior exit panel or failed to properly inspect and maintain the interior exit panel to ensure it was functioning properly." Dkt. 166 at 7–9.

To establish breach, a plaintiff must show that the defendant's conduct fell below the applicable standard of care. *Pennington*, 223 N.E.3d at 1094. Here, it's undisputed that Otis's maintenance contract ended about six months before the elevator entrapment. *See* dkt. 166 at 7. The Court assumes without deciding that Otis owed a duty to avoid later harm to a third party—the Daskalakises—that was reasonably foreseeable during its maintenance contract. *See id.* at 6 (relying on *Peters v. Forster*, 804 N.E.2d 736, 743 (Ind. 2004)). To avoid summary judgment, the Daskalakises must designate evidence allowing a reasonable jury to find that Otis breached that duty. *See Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–89, 1089 n.1 (7th Cir. 2018) (affirming summary judgment on an Indiana-law negligence claim, explaining that "[a]ll a federal movant has to do [to be entitled to summary judgment] is point to the absence of evidence to support the claim").

The Daskalakises do not designate evidence from which a jury could reasonably find that Otis breached a duty, but only speculate that Otis may have breached a duty related to its elevator maintenance contract. *See id.*;

*Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment."). They argue that the elevator interior escape panel "*may have* been nonfunctional for years," but designate no evidence to support any connection to Otis's contractual duties. Dkt. 166 at 6 (emphasis added).[1] They also rely on their expert, Mr. Vallone, but concede that his opinion "does not assign fault or resolve . . . who sealed the interior exit panel, when it was sealed, or who owed a duty to inspect it." *Id.* at 2–3. Finally, they cite testimony that Otis "could have" been the contractor that secured side panels inside the elevators after they came loose, though the witness "[did]n't know for certain" and did not "have any independent knowledge" whether that was the case. *Id.* at 8; dkt. 162-7 at 15 (Van Rhoon Dep. at 143). Even if Otis had secured loose side panels, the Daskalakises do not explain how that provides a non-speculative connection to the interior exit panel. *See* dkt. 166 at 8.[2] A reasonable jury could not find from this speculation that Otis breached any duty to avoid

---

[1] The Daskalakises do not designate evidence or argue that Otis could be liable based on the auxiliary contacts that ultimately failed, causing the elevator entrapment, as addressed below regarding TKE's motion for summary judgment. *See* dkt. 166.

[2] The Daskalakises imply that Mr. Van Rhoon's testimony is ambiguous about whether it was the elevator's side panels or interior exit panel that came loose and needed to be reattached. Dkt. 166 at 8. But Mr. Van Rhoon's deposition testimony is clear that when he was talking about which elevator-maintenance company may have secured the panels, he was talking about side panels. Dkt. 162-7 at 10,15 (Van Rhoon Dep. at 53, 143). As explained below regarding CP Indy's motion for summary judgment, other designated evidence—about what Mr. Van Rhoon told firefighters during the entrapment—is ambiguous whether it refers to side panels or the interior exit panel. *See id.* Regardless, that testimony does not state or suggest that Otis was involved with securing the interior exit panel closed.

reasonably foreseeable harm to a third party from being trapped in the elevator. *See Austin*, 885 F.3d at 1087–89; *Peters*, 804 N.E.2d at 743.

While the Daskalakises designate evidence that Otis completed the last annual safety inspection before the elevator got stuck, that too provides only a speculative connection to the entrapment here. *See* dkt. 166 at 8. The hotel's building engineer testified that he did not see Otis "open the safety hatch on the top of the elevator car," but that cannot support a triable issue of fact because he was unfamiliar with what Otis did during the annual safety inspection and could remember only one unrelated test from the inspection:

> A Well, I remember when they did a drop test, they have always got to have their weights on property, and that's how I would know. I mean, whether what date it was or anything, it's probably on the computer, but that's how I would know. And they would notify us, hey, we're doing a drop test, doing a test. So we would be privy to that because of occupancy, you know, it falls on either a zero-occupancy day or 30 percent occupancy day, that has a difference on who's going to use elevators.
>
> Q What else did they do during that test?
>
> A Well, I know they audit the safety systems, the braking system. That's about all I know.
>
> Q When you say they audit the safety system, what does that mean?

A Well, they check them out, just making sure the parameters are met. You know, if a door opens, you know, what does the elevator do, what's the reaction? That's about all I know.

Q Okay. When you say if a door opens, are you talking about the front elevator doors --

A Yes, ma'am. Yes, ma'am.

Dkt. 162-7 at 16–18 (Van Rhoon Dep. at 154–56).

The Daskalakises' designated evidence therefore does not allow a reasonable jury to find that Otis knew the ceiling hatch had been altered so that it could not be opened or that it otherwise breached any duty. *See Hale v. SS Liquors, Inc.*, 956 N.E.2d 1189, 1192 (Ind. Ct. App. 2011) (An independent contractor's liability requires that it "negligently completed the work and it was reasonably foreseeable that a third party would be injured by such work."). That "is especially true here, where the alleged injury was allegedly caused by an elevator, which is a complex mechanical device." *Hartford v. Schindler Elevator Corp.*, No. 11-CV-00453, 2012 WL 275210 at *2 (S.D. Ind. 2012) (citing *Davlan v. Otis Elevator Co.*, 816 F.2d 287, 296 (7th Cir. 1987) (applying Illinois law)). In both *Hartford* and *Davlan*, the elevator maintenance company was entitled to summary judgment because the plaintiff did not designate evidence that the company knew of the problem or failed to correct the problem. *Id.* ("[C]oncluding that . . . Schindler breached its duty . . . would require this Court to speculate, which it will not do."); *Devlan*, 816 F.2d at 295 ("Plaintiff did not show that Otis had prior knowledge of a levelling problem

with the elevator on which plaintiff was injured. Neither did plaintiff show that Otis failed to maintain that elevator in such a manner that it failed to discover and correct an intermittent levelling problem."). The same is true for Otis here.

In short, "there must be some evidence connecting" Otis to the problems with the elevator that caused the Daskalakises' entrapment. *Flowers*, 105 F.4th at 947. The Daskalakises have not designated such evidence, but rely on only speculation and "inferential leaps." *Id.* But "courts deal in proof and the leaps [the Daskalakises offer] cannot be used to defeat summary judgment." *Id.* Otis is therefore entitled to summary judgment.[3]

**B. TKE**

**1. Negligence**

TKE argues that no reasonable jury could find it negligent because it was not responsible for or did not know about any problems with the elevator before the Daskalakises were trapped. Dkt. 152 at 7–8. The Daskalakises respond that TKE was negligent for several reasons, including for failing to maintain the elevator's auxiliary contacts. Dkt. 167 at 8–10.

TKE does not dispute at this stage that the auxiliary contacts failed, causing the elevator to get stuck with the Daskalakises inside. *See* dkt. 152 at 9. It also does not dispute that it had a duty under its contract to maintain the auxiliary contacts. *See id.* at 10–11; *Ryan v. TCI Architects/Eng'rs/Contractors, Inc.*, 72 N.E.3d 908, 914 (Ind. 2017) ("If a contract affirmatively evinces an

---

[3] Because Otis is entitled to summary judgment, its motion to exclude Mr. Vallone's expert testimony as to the claim against it is **DENIED as moot**. Dkt. [151].

intent to assume a duty of care, actionable negligence may be predicated on the contractual duty."). Instead, TKE contends that no reasonable jury could find that it breached that duty. *See* dkt. 152 at 8–12.

The Daskalakises have designated expert testimony from Mr. Vallone that auxiliary contacts rarely, if ever, fail instantly. Dkt. 162-3 at 20–22 (Vallone Dep. at 115–17).[4] Instead, a technician doing preventative maintenance "should be able to tell when they're getting pitted, when they're getting dirty, when they've been burned . . . all of that." *Id.* These signs generally develop over "weeks to months" and may not affect the elevator's operation until the contact fails. *Id.*

TKE argues that Mr. Vallone's testimony does not show a triable issue of fact because it's "entirely speculative," dkt. 152 at 13–15, but Mr. Vallone testified about his own experience with auxiliary contacts based on 25 years' experience in the industry, dkt. 162-3 at 12, 20–22 (Vallone Dep. at 100, 115–17) ("[I]n my experience as a maintenance mechanic and a supervisor of mechanics, the contacts will show you that they're going [to] fail. Especially

[4] While both TKE and CP Indy later filed motions to exclude Mr. Vallone's expert opinions at trial, dkt. 184; dkt. 185, TKE does not challenge Mr. Vallone's qualifications at summary judgment, dkt. 152 at 13–15. *See* dkt. 41 at 4 (case management plan requiring that any motion "to preclude expert witness testimony at the summary judgment stage" be filed with the summary judgment brief). Because those motions address admissibility at trial, rather than at summary judgment, the Court does not address them at this stage.
TKE separately argues that Mr. Vallone's opinions in his supplemental report should be excluded from consideration at summary judgment as untimely. *See* dkt. 152 at 15–17. Since Mr. Vallone's supplemental report responds to opinions of Defendants' experts, *see id.*; dkt. 162-14 at 26–37, which the Court does not reach in resolving the summary judgment motions, the Court does not address the arguments about the supplemental report at this stage.

replaceable contacts are always going to be able to be seen when they're not working properly, or when . . . they're not wearing properly.").[5] Contrary to TKE's argument, dkt. 174 at 18, Mr. Vallone did not have to personally inspect the auxiliary contacts at issue to testify based on his experience about how they fail and what preventative maintenance should entail and reveal. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) ("The lack of examination of [the plaintiff] does not render [an expert doctor's] testimony inadmissible."). And while TKE's expert opines that auxiliary contacts "can fail spontaneously without warning" for "undetectable" reasons, dkt. 149-6 at 15, "a case of dueling experts . . . is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony," *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008). A reasonable jury could therefore find that had TKE performed the preventative maintenance called for under the maintenance agreement, it would have known of a problem with the auxiliary contacts before the elevator failed.

The Daskalakises have also designated evidence allowing a reasonable jury to find that TKE should have performed such a check, but did not. TKE was required to provide "<u>proactive</u> preventative maintenance" "[d]iligently and in a first class, complete and workmanlike manner, free of defect or deficiency."

---

[5] TKE argues that Mr. Vallone admitted that when auxiliary contacts are "in the process of failing, you might not see anything." Dkt. 152 at 12. But in context, Mr. Vallone was saying that a failing contact may not affect elevator *operation*. Dkt. 162-3 at 22 (Vallone Dep. at 117). In the same answer, he elaborated that "[i]f you're performing preventative maintenance on these contacts, that's when you would see stuff like [a failing auxiliary contact]." *Id.*

Dkt. 162-15 at 8; *see Farah, LLC v. Architura Corp.*, 952 N.E.2d 328, 336 (Ind. Ct. App. 2011) ("In a contract for work or services, there is a duty to perform the work skillfully, carefully, diligently, and in a workmanlike manner; failure to carry out that duty may constitute . . . negligence."). And Mr. Vallone testified based on his experience that "look[ing] at all the contacts" is part of a "regular" preventative maintenance visit. Dkt. 162-3 at 3–4 (Dep. at 20–21).

TKE's records, however, do not indicate that the contacts were inspected or any maintenance or inspections were completed on the controller or wiring. *See* dkt. 162-13. In fact, TKE does not contest that no designated evidence shows that it performed preventative maintenance on the auxiliary contacts. *See* dkt. 152 at 10; *Kelly v. GEPA Hotel Owner Indianapolis LLC*, 993 N.E.2d 216, 222 (Ind. Ct. App. 2013) (reversing summary judgment when "maintenance records . . . show[ed] little to no inspection of the threshold sill in the elevator"). TKE instead argues, based on its own expert's testimony, that the auxiliary contact's failure "was, at most, a one-time intermittent event." Dkt. 152 at 12. But because that evidence is contested and a reasonable jury could find that an inspection would have revealed the issue before the elevator's failure, there is a triable issue of fact. *See Kelly*, 993 N.E.2d at 222 ("With the allegations being negligent inspection and maintenance, a juror could reasonably conclude, based on [an expert's] opinion, that a more careful inspection of the elevator on the two incidents prior to Kelly's fall would have revealed a defect in the motion controller."); *Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 577 (7th Cir. 1994) (reversing summary judgment in elevator-

maintenance case under Indiana law and explaining that "[a] probability of negligence may be supported by expert testimony or common sense inference").

TKE therefore is not entitled to summary judgment on the Daskalakises' negligence claim.[6]

**2. Punitive Damages**

TKE argues that it's entitled to summary judgment on the Daskalakises' request for punitive damages because they cannot show gross negligence or willful and wanton misconduct. Dkt. 152 at 22–24. The Daskalakises respond only that TKE can be liable for punitive damages for "disabling the interior exit panel" at the top of the elevator. Dkt. 167 at 20–21.

Under Indiana law, punitive damages have their "own prerequisite elements of proof" that impose a "high hurdle" for plaintiffs. *Yost v. Wabash College*, 3 N.E.3d 509, 514, 524 (Ind. 2014). "In tort actions, punitive damages may be awarded upon a showing of willful and wanton misconduct such that the defendant subjected other persons to probable injury, with an awareness of such impending danger and with heedless indifference of the consequences." *Id.* at 523. "[P]unitive damages are not commonplace and rarely appropriate." *Id.*

Here, the Daskalakises seek punitive damages based on their argument that TKE modified the ceiling exit panel, but they designate no evidence to

---

[6] The Court therefore does not address at this stage whether TKE was negligent in inspecting, maintaining, and repairing the elevator's internal exit panel, or in responding to the elevator entrapment. *See* dkt. 167 at 14–20. TKE's motion to strike a portion of the Daskalakises' surreply is **DENIED as unnecessary** because the surreply addresses only TKE's response to the elevator entrapment. Dkt. [179].

support TKE's responsibility for the modifications. *See* 167 at 21. Instead, the limited designated evidence on this point is that the modifications may have been made around 2007—more than 15 years before TKE's maintenance contract began. Dkt. 148-11 at 19 (Van Rhoon Dep. at 58). Without designated evidence that TKE modified that ceiling panel before the entrapment, *see id.* at 28 (Dep. at 96), no reasonable jury could find that TKE committed willful or wanton misconduct related to the elevator's ceiling panel. *See Baldwin v. Standard Fire Ins. Co.*, 269 N.E.3d 1197, 1208–09 (Ind. 2025) ("It is not enough that the defendant may have been negligent or exercised poor judgment; the additional element of conscious wrongdoing must also be present.").

The Daskalakises offer no alternative basis for punitive damages against TKE. *See* dkt. 167 at 20–21. TKE is therefore entitled to summary judgment on the issue of punitive damages. *See Baldwin*, 269 N.E.3d at 1208–09; *Purnick v. C.R. England, Inc.*, 269 F.3d 851, 852–54 (7th Cir. 2001) (affirming grant of summary judgment for defendant on punitive damages under Indiana law notwithstanding liability for underlying negligence).

**C. CP Indy**

CP Indy argues that it's entitled to summary judgment because it exercised reasonable care by hiring elevator maintenance contractors and submitting to regulatory inspections. Dkt. 155 at 13–17. The Daskalakises respond that CP Indy knew that the elevator's interior exit panel did not open as it should and was responsible for it, but did not fix it. Dkt. 165 at 2–7.

CP Indy owed the Daskalakises, as its invitees, a duty to exercise reasonable care for their protection while they were on the premises. *Pennington*, 223 N.E.3d at 1097. "The duty to exercise reasonable care extends to an unreasonable risk of harm that the defendant should realize exists and should expect invitees to overlook or fail to protect themselves against." *Id.*

Here, a reasonable jury could find that CP Indy knew or should have known that the interior exit panel was secured closed instead of functional. *See Pennington*, 223 N.E.3d at 1097. CP Indy's building engineer, Mr. Van Rhoon, testified that he knew and told the firefighters that some kind of clips or pins secured the panel. Dkt. 162-7 at 8–9 (Van Rhoon Dep. at 60–61). And the fire chief testified that Mr. Van Rhoon told him that "they had secured" the escape hatch previously and that "it may" impede the firefighters' ability to get it open. Dkt. 162-4 at 30–31 (Thompson Dep. at 137–38) ("[Mr. Van Rhoon's information] was specific enough to lead me to believe that I was going to have to start cutting into an elevator."). While other testimony indicates that Mr. Van Rhoon may have been talking about only the elevator's side panels, dkt. 162-7 at 3–5 (Van Rhoon Dep. at 50–52), a reasonable jury could find that he knew that the interior exit panel in the ceiling had been secured closed. *See Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inference to draw from the facts; these are jobs for a factfinder."). As CP Indy's employee, Mr. Van Rhoon's knowledge is imputed to CP Indy. *See* dkt. 155 at 18; *St. Mary's Med. Ctr. v. Loomis*, 783 N.E.2d 274,

279 (Ind. Ct. App. 2002) ("[E]mployees' knowledge of a dangerous condition may be imputed to their employer.").

While CP Indy hired an elevator contractor to maintain the elevator and the State of Indiana inspected the elevator, that does not establish as a matter of law that CP Indy acted reasonably. *See Isgrig v. Trs. of Ind. Univ.*, 256 N.E.3d 1238, 1245 (Ind. 2025) ("[L]iability for injury ordinarily depends upon the power to prevent injury."). In addition to the designated evidence allowing a reasonable jury to find that CP Indy knew that the interior exit panel had been secured closed, under the maintenance agreement, the elevator contractor "will not be responsible for car enclosures" including, "wall panels, door panels . . . [and] hung ceilings." Dkt. 162-15 at 12. The Daskalakises' expert testified that the interior exit panel was ultimately CP Indy's responsibility under this exclusion. Dkt. 162-3 at 25 (Vallone Dep. at 181). And CP Indy does not contend that the interior exit panel was unambiguously the contractor's responsibility under the agreement. *See* dkt. 171 at 8–9.

Since a reasonable jury could find that CP Indy was responsible for the exit panel under the contract and that it knew that the panel had been secured closed, hiring Otis and then TKE under the elevator maintenance contracts does not entitle CP Indy to summary judgment. *See Booher v. Sheeram, LLC*, 937 N.E.2d 392, 395 (Ind. Ct. App. 2010) (affirming summary judgment because "when Hampton Inn realized there was a problem, it retained an expert to fix the problem"). And CP Indy cites no authority to support its argument that it acted reasonably because the State of Indiana's elevator

inspection found that the elevator was safe to operate. *See* dkt. 171 at 8, 12–13; *cf. Kelly*, 993 N.E.2d at 222 (reversing summary judgment for hotel in elevator liability case). Instead, the Daskalakises' designated evidence allows a jury to find that CP Indy knew the interior exit panel had been secured closed yet didn't ensure that either its contractor or the state inspector opened the exit panel to check if it worked. *See Isgrig*, 256 N.E.3d at 1249 ("A landowner's duty to invitees is to exercise reasonable care under the circumstances, which includes the duty to reasonably inspect and maintain the premises.").

CP Indy therefore is not entitled to summary judgment. *See N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind. 2003) ("Whether a particular act or omission is a breach of duty is generally a question of fact for the jury.").

**D. Modified Impact Rule**

Both TKE and CP Indy argue that they are entitled to summary judgment under Indiana's modified impact rule. The rule allows a plaintiff to "recover damages when he or she, having suffered no physical injury, sustains a direct impact by the negligence of another and because of that direct involvement sustains an emotional trauma serious enough to affect a reasonable person." *K.G. by Next Friend Ruch v. Smith*, 178 N.E.3d 300, 306 (Ind. 2021). While a "direct physical impact" is required, it "need not cause a physical injury to the plaintiff and the emotional trauma suffered by the plaintiff need not result from a physical injury caused by the impact." *Condor v. Wood*, 716 N.E.2d 432, 434 (Ind. 1999).

TKE and CP Indy contend that the "jolts" and "swaying" the Daskalakises experienced are too slight to constitute direct physical impact. Dkt. 152 at 21–22; dkt. 155 at 10–12; dkt. 173 at 7. The Daskalakises respond that they suffered a direct physical impact when (1) they experienced two "jolts" when Elevator 3 descended and abruptly stopped; (2) felt the elevator "swaying"; and (3) were harnessed and hoisted by rope approximately 30 feet up the elevator shaft. Dkt. 167 at 22–25 (citing dkt. 162-2 at 3; dkt. 148-8 at 13–14).

A direct physical impact satisfies the modified impact rule even when it is "slight" or "rather tenuous" if the "court[] is satisfied . . . that the alleged mental anguish was not likely speculative, exaggerated, fictitious, or unforeseeable." *Atl. Coast Airlines v. Cook*, 857 N.E.2d 989, 996 (Ind. 2006). For example, the plaintiff's own pounding on the side of a truck to prevent it from running over her friend is "clearly" an "impact" under the rule. *Condor*, 716 N.E.2d at 432; *see Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind. Ct. App. 1998) (concluding that a diner's discovery of a worm on her fork while eating food in which the worm had been cooked qualified as a physical impact). Inhaling cigarette smoke and "feeling floor vibrations," by contrast, "stretches the outer limits of the impact requirement" when the emotional distress quickly subsided and did not require treatment. *Cook*, 857 N.E.2d at 999–1000.

Here, the undisputed designated evidence shows that the Daskalakises experienced two "jolts" and the "swaying" of the elevator when it descended and then were hoisted about 30 feet in a harness. The jolts, which were like "hitting the brakes on a car when you see a car jump in front of you," dkt. 148-

7 18; 148-8 at 14, are akin to the impact "sustained in pounding on" a truck in *Conder*, 716 N.E.2d at 435. Even if that weren't enough, being hoisted by a harness and rope over 30 feet during an elevator evacuation is far more than the "floor vibrations" in *Cook* and is physical in nature. Dkt. 164-10 at 19–21; *see Dollar Inn., Inc. v. Slone*, 695 N.E.2d 185 (Ind. Ct. App. 1998) (needle stab in plaintiff's thumb satisfied the rule because "the direct impact need not be substantial or permanent"). In fact, neither TKE nor CP Indy respond to Plaintiffs' argument that being hoisted by ropes qualifies as a direct physical impact. *See* dkt. 171 at 13–14; dkt. 173 at 7–8; dkt. 174 at 10–12.[7] Indeed, "it matters little how the physical impact occurs, so long as that impact arises from the plaintiff's direct involvement in the tortfeasor's negligent conduct." *Conder*, 716 N.E.2d at 435.

Nor is this case like *Cook*, when the alleged mental anguish was "temporary" and "speculative." 857 N.E.2d at 1000. Instead, the Daskalakises sought medical and mental health treatment for their emotional trauma and were prescribed medication after being diagnosed with "PTSD, specific phobia, and panic disorder." Dkt. 162-17 at 3–4. That is enough to satisfy the modified impact rule. *See K.G.*, 178 N.E.3d at 306, 309; *Spangler v. Bechtel*, 958 N.E. 458, 467 (Ind. 2011) ("[T]he direct impact requirement . . . serves to sift legitimate claims of emotional harm from the spurious.").

---

[7] CP Indy argues that the "jolts" and swinging "are the only alleged 'impacts' Plaintiffs assert . . . so are thus the only impacts the Court should consider." Dkt. 171 at 13 n.4. But CP Indy is wrong; the Daskalakises squarely argue that they "experienced physical impacts from being hoisted out of the elevator shaft" by ropes. Dkt. 167 at 24–25 (incorporated in dkt. 165 at 9).

TKE resists the conclusion by arguing that the Daskalakises must have either suffered a physical injury or witnessed the injury of a third party. Dkt. 150-1 at 15; 173 at 7–8; dkt. 174 at 10–12. But that is not required under Indiana law. *See Spangler*, 958 N.E. at 467 ("An action seeking emotional distress damages" under "the modified impact rule[ ] does not require the negligent infliction of injury on a person other than the plaintiff."); *Condor*, 716 N.E. 432 (Ind. 1999) ("[T]he impact need not cause a physical injury to the plaintiff and the emotional distress suffered by the plaintiff need not result from a physical injury caused by the impact."). TKE and CP Indy therefore are not entitled to summary judgment under the modified impact rule.

## IV.
## Conclusion

Otis's motion for summary judgment is **GRANTED**, dkt. [150], and its motion to exclude Mr. Vallone's testimony as to the claim against it is therefore **DENIED as moot**, dkt. [151]. The **clerk is directed** to terminate Otis Elevator Company as a party on the docket.

TKE's motion for summary judgment is **DENIED** on the negligence claim against it and **GRANTED** as to punitive damages. Dkt. [149]. TKE's motion to strike is **DENIED as unnecessary**. Dkt. [179]. CP Indy's motion for summary judgment is **DENIED**. Dkt. [154].

Magistrate Judge Dinsmore is asked to hold a status conference to discuss settlement and trial readiness.

**SO ORDERED.**

Date: 9/23/2026

James Patrick Hanlon

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel.